**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VANESSA R. HOLLIS-EARL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No.   13-cv-972-CJP[1] |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Vanessa R. Hollis-Earl is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Vanessa Hollis-Earl applied for benefits in April 2010 alleging disability due to a back injury, arthritis in her back, and chronic knee inflammation (Tr. 134). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Rebecca

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 30).

LaRiccia denied the application for benefits in a decision dated October 25, 2011 (Tr. 24–34).   Hollis-Earl's request for review was denied by the Appeals Council, and the October 25, 2011 decision became the final agency decision (Tr. 1). Hollis-Earl has exhausted her administrative remedies and has filed a timely complaint in this court seeking judicial review of the ALJ's adverse decision.

In her brief, Hollis-Earl raises the following issues: (1) whether the ALJ erred in assessing plaintiff's residual functional capacity (RFC) in that she improperly weighed the medical opinions, did not explain how the medical evidence supported her findings, and did not consider plaintiff's obesity and (2) whether the ALJ erred in her assessment of plaintiff's credibility.

## APPLICABLE LEGAL STANDARDS

**A.     Disability Standard**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).   A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For the purposes of this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities for pay or profit.   20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled: (1) is the claimant presently unemployed; (2) does the claimant have an impairment or combination of impairments that is severe; (3) does the impairment(s) meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, can the claimant perform past relevant work; and (5) is the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

**B.    Judicial Review**

The scope of judicial review of the Commissioner's decision is limited.   This Court reviews the decision to ensure that it is supported by substantial evidence and that no mistakes of law were made.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Hollis-Earl was in fact disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v.*

*Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See*, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein. The ALJ "must provide an accurate and logical bridge between the evidence and her conclusion that a claimant is not disabled." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008)). "If a decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." *Kastner*, 697 F.3d at 646 (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002) (internal quotation marks omitted).

## THE DECISION OF THE ALJ

ALJ LaRiccia denied Hollis-Earl's claim on October 25, 2011 in a written decision (*See* Tr. 24–34). The ALJ followed the five-step analytical framework outlined in 20 C.F.R. § 404.1520 (*See* Tr. 24–34). At step one, the ALJ

determined that Hollis-Earl had not engaged in substantial gainful activity since the alleged onset date (Tr. 26).   The ALJ also found that Hollis-Earl is insured for DIB through December 31, 2014 (Tr. 26).   At step two, the ALJ found that Hollis-Earl had severe impairments of "discogenic and degenerative disorders of the lumbar spine" (Tr. 26).   At step three, the ALJ determined that Hollis-Earl's impairments did not meet or equal a listed impairment (Tr. 26).

At step four, the ALJ concluded that Hollis-Earl had the residual functional capacity to perform work at the light exertional level, with limitations (Tr. 27).   The ALJ then concluded at step five, based on the testimony of a vocational expert, that Hollis-Earl could not do her past work, but she could perform other jobs which exist in significant numbers in the national and local economy (Tr. 32, 33).   As a result, Hollis-Earl was not disabled.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Hollis-Earl in her complaint.

**1.    Agency Forms**

Vanessa Hollis-Earl was born in January 1961, and was 49 years old on the alleged onset date—April 2, 2010 (Tr. 146).   She was insured for DIB through December 31, 2014 (Tr. 146).[3]

She has a 12th grade education, and prior to the alleged onset date, she

---

[3]  The date last insured is relevant only to the claim for DIB.

worked at a dry cleaner as a clothes presser; at a nursing home in housekeeping and laundry; and at a community care program as a homemaker (Tr. 135–36, 152–55).   As a homemaker, she went to the homes of senior citizens and completed household chores such as cleaning, mopping, washing dishes, making beds, cooking, and laundry (Tr. 155).   Her job required her to stand, walk, stoop, crouch, and reach for a majority of her workday, and she frequently lifted heavy objects over 100 lbs. (Tr. 155).

Hollis-Earl stopped working on April 2, 2010 due to pain in her back and knee (Tr. 134).   She said she is in constant pain all day every day (Tr. 200).   She cannot sit or stand for any period of time because of the pain, and she has difficulty walking and must use a cane (Tr. 163, 169).   The pain also affects her ability to lift, squat, bend, reach, kneel, climb stairs, complete tasks, and use her hands (Tr. 168).

Hollis-Earl no longer goes shopping or does work around her house or in her yard (Tr. 165–66).   She can no longer take baths and must take showers instead; she cannot bend over to tie her shoes; she had to cut her hair because she can no longer go to the beauty shop; she only drives short distances; and while she can still feed herself, she no longer cooks (Tr. 164, 166).   She lives with her daughter and she relies on her and other family and friends to help (Tr. 163–66).   She used to enjoy taking walks and playing dominoes, but no longer does either because of the pain (Tr. 167).   She still talks on the phone with her family, but no longer leaves the house for social activities (Tr. 167–68, 188).

Hollis-Earl said she spends most days moving between her bed and the couch trying to get comfortable (Tr. 164).   She has to take numerous medications to tolerate the pain (Tr. 170).   However, the medications make her drowsy, so she spends most of her time sleeping (Tr. 170).   She also said the pain medications affect her ability to pay attention and follow spoken directions (Tr. 168).

## 2.   Evidentiary Hearing

Plaintiff was represented by counsel at the hearing on July 28, 2011 (Tr. 39–41).

Hollis-Earl testified that in April 2010, her physician, Dr. Gemo Wong, restricted her to light duty at work (Tr. 44).   She said a short time later[4]  he said he didn't want her working at all (Tr. 44–45).   She also testified that she sees Dr. Wong "a couple of times a month" at scheduled and unscheduled visits (Tr. 45). She said she would go even when she did not have an appointment "because of [her] back" (Tr. 45).

She testified that she was still having problems with her back (Tr. 45).   She stated that there's nothing she can do to lessen her pain (Tr. 45).   She rated her pain as an 8 out of 10 without medication, and claimed that medication only reduces her pain to a 7 (Tr. 46).   She is currently taking hydrocodone and Flexeril, tramadol, Cymbalta, and naproxen, and the medications make her sleepy (Tr. 46, 50).   She also reported she was going to begin getting epidural steroid injections

---

[4]  The timeframe at issue is not precise.   Hollis-Earl said she went back to see Dr. Wong "a couple of weeks later" (Tr. 44–45).   The ALJ followed up by asking "So in May then?" (Tr. 45).   And Hollis-Earl replied, "Yeah.   I'll say May." (Tr. 45).

again (Tr. 46).   She said the injections help "a little bit" because they "just cause the pain to be a little duller," but they do not drop her pain below a 7 (Tr. 46).   She testified that physical therapy does not provide any relief (Tr. 47).   She said she's interested in surgery, and she previously indicated she did not want surgery because her doctor said she could try more conservative treatments first (Tr. 46, 47).

Hollis-Earl testified that she has good days and bad days (Tr. 47).   She has one good day a week and she can take a shower by herself and pour herself a bowl of cereal (Tr. 47, 48).   On her bad days, there's nothing she can do and she spends the majority of the day in bed (Tr. 48).   Her daughters take care of her and do all the household chores (Tr. 48, 49).   She does not shop; she has not driven in about a year; and she no longer takes walks or goes to her grandson's softball games (Tr. 49–50).   She wears slip-on shoes because she cannot bend over to tie her shoes. (Tr. 50).

A vocational expert (VE) also testified.   The ALJ asked the VE one hypothetical question.   That question required the VE to assume a person 49-years-of-age with a high school education and who was able to do work at the light exertional level, with the following limitations:

- Occasionally stoop, kneel, crouch, and crawl;
- Occasionally climb ramps and stairs;
- No climbing ladders, ropes, or scaffolds;
- No exposure to hazards such as unprotected heights or dangerous and moving machinery; and
- Requires use of a cane for prolonged ambulation.

(Tr. 51).

The VE testified that this hypothetical person could perform her past job as a clothes presser (Tr. 52).   Upon being questioned by Hollis-Earl's attorney, the VE stated that an individual who needed to use a cane while standing could still be a presser, and that using a pressing machine involved a lot of heat (Tr. 53).   The VE also testified that the hypothetical person could perform other jobs which exist in significant numbers, such as counter clerk or office helper, both of which are at the light exertional level (Tr. 52).   The VE also testified that based on Hollis-Earl's past work history, none of her skills transfer to work at the sedentary exertional level (Tr. 52).

### 3.   Medical Records

Hollis-Earl is regularly seen at Community Health and Emergency Services ("Community Health") by a nurse practitioner or by Dr. Gemo Wong.   The first time she was seen at Community Health for back pain was in October 2009.   At that time, she said that she had recurrent episodes of pain for the previous 2–4 months.   The pain was in her lower back and radiated down her leg, and it fluctuates in severity.   During one episode, she was unable to get out of bed or move in bed.   She was given Flexeril and hydrocodone.

Hollis-Earl underwent an MRI of her lumbar spine that same month which revealed a small left L5-S1 foraminal disc herniation, causing moderate stenosis contacting the exiting left L5 nerve root, with lower lumbar facet hypertrophy and right side greater-than-left sacroiliitis.

She was seen at Community Health again in December 2009 and reported increased back pain when lifting and bending while cleaning at work.

On March 5, 2010, Hollis-Earl went to the emergency room at Union County Hospital for lower back pain that radiated down to her right leg.   She rated her pain as a 10 out of 10.   The emergency room doctor recommended physical therapy, and Hollis-Earl began a four week regimen to try to relieve her pain.

Hollis-Earl followed-up with the nurse practitioner at Community Health on March 19, 2010.   She reported that her pain level was a 7 out of 10 and her current work duties increased her pain.   She also said that she took the Flexeril only in the evening because it made her drowsy.   She saw Dr. Wong three days later, and reported her pain as a 10.   He referred her to a neurosurgeon.   However, the neurosurgeon's first available appointment was not until April 2011, so Dr. Wong referred her to a pain management specialist in the meantime.

Hollis-Earl contacted Dr. Wong's office on April 5, 2010 and said that she needed a note for light duty at work.   She saw Dr. Wong that same day and reported her pain level as a 7 out of 10, and said she did not think she could do her job because of her back problems.   Dr. Wong wrote in his notes that "patient cannot work present type of work."

Hollis-Earl saw Dr. Im Sun Hong at the St. Francis Pain Clinic on April 6, 2010.   Dr. Hong noted that four weeks of physical therapy yielded "mild" improvement, but Hollis-Earl still experienced moderate to severe pain in her lower back.   He observed that she was "in moderate distress in a sitting position."   After

a physical examination, he noted she had normal lumbar lordosis, moderate tenderness to palpation, and her lower back flexion was restricted.   However, her sensory function and reflexes were intact.   Dr. Hong administered an epidural steroid injection that day.

Ten days later, Hollis-Earl followed-up with the nurse practitioner at Community Health.   She reported that she received the epidural steroid injection, but said that it "hasn't helped."   She said her pain level was a 6 out of 10, her lower back was numb, and she was unable to take walks.   The nurse practitioner observed that Hollis-Earl "couldn't tolerate sitting on the exam table."

Hollis-Earl returned to the St. Francis Pain Clinic on May 7, 2010 for a second injection.   She reported that the first "helped quite a bit for about 2 weeks" but the pain returned at the same intensity when she increased her physical activity. She had another follow-up appointment at Community Health seven days later. She said she had some improvement in her back pain, but still reported her pain level as a 7 out of 10.

The records indicate she did not return to Community Health until August 2010.   She reported her pain level as a 7 out of 10, and said her pain was especially bad in the morning and she had difficulty getting out of bed.   She also reported that she couldn't walk because her feet were numb.   Hollis-Earl began another round of physical therapy later that month.   She was supposed to go to physical therapy three times a week, however, over the course of approximately seven weeks, she went only eight times.

In September 2010, she again saw Dr. Wong at Community Health.   She reported her pain level as an 8 out of 10.   Dr. Wong noted that she could not lift over 10 pounds, bend, walk, or climb without being in pain.   Dr. Wong also indicated that she was unable to flex her back more than 10 degrees.

In October 2010, Hollis-Earl returned to Community Health.   She reported that therapy worked well for one hour and then her pain returned.   She also reported that the epidural injections did not help.   Hollis-Earl reported that her legs were more painful, her knees were "giving out," and she experienced urinary incontinence when she was under stress and when she sneezed or coughed.   The nurse practitioner noted decreased range of motion in her lower back, tenderness to palpation, and a positive straight leg test.   She also noted that Hollis-Earl had no sensory deficits and normal strength and tone in her legs.

Hollis-Earl underwent another MRI in October 2010.   She then went to Community Health to discuss the results.   She reported her pain was a 7 out of 10, The nurse practitioner again noted a decreased range of motion in her lower back, tenderness to palpation, and a positive straight leg test.   She also noted that while Hollis-Earl had no sensory deficits and normal tone in her legs, she had decreased strength in her legs.

On March 2, 2011, Hollis-Earl had her first visit with the neurosurgeon, Dr. Sonjay Fonn.   Dr. Fonn stated that an MRI showed bilateral foraminal stenosis at the L5/S1 level "which could certainly be the cause of her symptomology."   He administered bilateral transforaminal epidural steroid injections on March 10th,

17th, and 31st.   On April 6, 2011, Hollis-Earl told Dr. Fonn that the lumbar epidural injections gave her "some" relief and she wanted to hold off from surgical intervention at that time in order to explore other treatment options.   Dr. Fonn stated that he could try a course of facet blocks at L4/5 and L5/S1 and then possibly try radio frequency ablation.   If those treatment options failed to work, Dr. Fonn stated that Hollis-Earl "may be a candidate for surgical intervention."   On June 1, 2011, she told Dr. Wong that the epidural injections she received from Dr. Fonn were not helping.   A couple weeks later on June 22, 2011, Hollis-Earl told Dr. Fonn that she wished to hold off on any treatment options at that time, and wanted to think about her options "and proceed with the injections in a couple of months."

## 4.     Consultative Examination

Dr. Muhammad Ali Memon examined Hollis-Earl in July 2010 at the request of the State of Illinois in connection with her application for benefits (Tr. 422–29). The examination lasted 45 minutes (Tr. 426).   Hollis-Earl told Dr. Memon that her back pain ranged between 7 and 10 in intensity, and radiated down her legs bilaterally (Tr. 423).   She also told him that her pain was precipitated by prolonged sitting, walking, and lifting (Tr. 423).

Upon examination, Dr. Memon noted that Hollis-Earl was "[a] medium built African American woman . . . [who] does not seem to be in acute distress" (Tr. 424). He also noted that her straight leg tests were negative for pain, her gait was normal, the muscle strength in her legs was normal, and the range of motion in her legs was intact except she had difficulty with hip flexion (Tr. 424).   Dr. Memon observed

Page 13 of 31

that she had no paraspinal muscle spasms or muscle atrophy, however, she did have lumbar tenderness and her spinal flexion, extension, and lateral rotation was limited (Tr. 424, 428).   She had mild difficulty getting on and off the exam table, tandem walking, walking on her toes, and walking on her heels (Tr. 424).   She was unable to squat and rise and she was also unable to hop on her left leg (Tr. 424).   Dr. Memon opined that Hollis-Earl's "ability to sit, stand, walk, lift and carry may be affected due to her back pain and herniated disc, the diagnosis of which is reported in the pain management notes, however there is no MRI report available to confirm diagnosis." (Tr. 426).

**5.     State Agency RFC Assessments**

In August 2010, shortly after the consultative examination, a state-agency physician, Dr. Reynaldo Gotanco, assessed Hollis-Earl's physical RFC based upon a review of the medical records (Tr, 287–94).   Dr. Gotanco indicated that Hollis-Earl's statements regarding limitations in walking and lifting due to pain were partially credible (Tr. 292).   He said her impairment could be expected to produce some limitations in function but the severity of the limitations she described "exceeds that supported by the objective medical findings" (Tr. 292). Specifically, Dr. Gotanco noted that Ms. Hollis-Earl had "no central spinal canal stenosis as evaluated by the radiological report" (Tr. 292).

Dr. Gotanco concluded that she could occasionally lift or carry 20 lbs., she could frequently lift or carry 10 lbs., she could stand and/or walk for about six hours in an eight-hour workday, and she was unlimited in her ability to push and

pull (Tr. 288).   He further concluded that she had two postural limitations in that she could only occasionally stoop and crouch due to spinal stiffness, limited range of motion, and lumbar lordosis (Tr. 289).

**6.   Dr. Wong's Opinion**

Dr. Wong completed a form that was similar to the physical RFC assessment form used by the state agency physician (Tr. 432–36).   The form was dated July 25, 2011—three days before the hearing in front of the ALJ.   Dr. Wong noted that Hollis-Earl suffered from chronic back pain since April 2010 (Tr. 432).   He characterized her pain as moderately severe and noted that it was constant (Tr. 435).   He noted that she elevated her legs and took hydrocodone and flexeril to relieve her pain, but the medication made her drowsy (Tr. 435).

Dr. Wong indicated that Hollis-Earl said she could not work at all (Tr. 435). She said she could only sit for 20 minutes at a time and stand for 30 minutes at a time (Tr. 435).   She also said she could not complete an 8-hour work day without an opportunity to lie down or recline every hour for 30 minutes (Tr. 435).

Dr. Wong opined that Hollis-Earl (1) could not climb stairs or ladders, stoop, or operate foot controls, (2) could only occasionally reach above shoulder level or lift or carry up to 10 lbs., (3) and could not repeatedly push or pull (Tr. 434–35). He further opined that she could not work in an environment that exposed her to marked changes in temperature and humidity, dust, fumes, gas, moving machinery, or unprotected heights, and she could only occasionally drive automotive equipment (Tr. 434).

**ANALYSIS**

Hollis-Earl is challenging the ALJ's RFC determination. A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week, or an equivalent work schedule. Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("SSR 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). Assessing a claimant's RFC requires an ALJ to consider the extent to which an individual's medically determinable impairment(s) and any related symptoms cause limitations that may affect his or her ability to do work activities. SSR 96-8P, at *2.

Hollis-Earl claims the ALJ's RFC determination is flawed because (1) the ALJ improperly weighed the medical opinions, did not explain how the medical evidence supported her findings, (2) failed to discuss or analyze Hollis-Earl's obesity, (3) and erred in evaluating Hollis-Earl's credibility for a variety of reasons. The Court will first address the credibility determination because this analysis will directly impact the Court's analysis of whether the ALJ improperly evaluated the medical opinion of Hollis-Earl's treating physician.

**A.     Credibility Determination**

Hollis-Earl attacks the ALJ's determination regarding the credibility or her statements about her pain and how it limited her ability to function. In assessing a

claimant's RFC, the ALJ must consider the claimant's statements about his or her symptoms and how they affect his or her ability to perform basic work functions. 20 C.F.R. § 404.1529(c); Social Security Ruling 96-7P, 1996 WL 374186, at *4 (July 2, 1996) ("SSR 96-7P").   The extent to which a claimant's statements can be relied on as probative evidence depends on the credibility of the statements. *Bjornson v. Astrue,* 671 F.3d 640, 645–46 (7th Cir. 2012); SSR 96-7P, at *4.   In evaluating the credibility of a claimant's statements, an ALJ must consider all of the evidence in the case record.   20 C.F.R. § 404.1529(c)(1); SSR 96-7P, at *4.   In particular, the ALJ should consider the objective medical evidence, as well as other evidence regarding the seven factors listed in the federal regulations: the claimant's daily activities; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; treatment other than medication; measures other than treatment used to relieve pain; and functional restrictions.   20 C.F.R. § 404.1529(c); S.S.R. 96–7P at *3, 5. Additionally, the ALJ must give specific reasons for the credibility determination so that the claimant and subsequent reviewers will have a fair sense of the weight given to the claimant's testimony and the reasons for that weight.   *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003); S.S.R. 96–7P at *4.

On judicial review, "[a]n ALJ's credibility determination is reviewed with deference, for an ALJ, not a reviewing court is in the best position to evaluate credibility."   *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal quotations omitted).   The ALJ's credibility determination will be reversed "only if it

is so lacking in explanation or support that [it is] 'patently wrong.'"   *Id.*

Here, ALJ LaRiccia found Hollis-Earl's allegations regarding her pain and limitations "not fully credible" (Tr. 30, 32).   The ALJ believed that at least some level of Hollis-Earl's pain was substantiated by the evidence, but the extent of her claims regarding the intensity, persistence, and limiting effects was not supported by the objective medical evidence.   The ALJ also identified a number of inconsistencies between Hollis-Earl's testimony at the hearing and other evidence that the ALJ felt diminished Hollis-Earl's overall credibility.

Hollis-Earl argues that the ALJ erred in her credibility determination for a number of reasons (*See* Doc. 23, pp. 15–22; Doc. 28, p. 11).   After carefully reviewing each of Hollis-Earl's arguments and the Commissioner's responses, the Court has decided in the interest of judicial economy to address only those reasons that it agrees with and are significant enough to require remand.

### 1. Objective Medical Evidence

One of the reasons Hollis-Earl argues that the ALJ's credibility determination is flawed is because the ALJ failed to explain *how* the objective medical evidence undermined Hollis-Earl's claims of pain and limitations (Doc. 23, p. 15).   The Court agrees.

While the ALJ spent nearly a page ticking off some of the medical evidence in the record, she did not specify which medical evidence supported her credibility determination.   While some of the evidence cited to appears to support the ALJ's

adverse credibility determination,[5] other evidence cited appears to support Hollis-Earl's testimony that she was in significant pain that greatly limited her ability to function.[6]   However, there is no explanation of why evidence favorable to Hollis-Earl was overcome by evidence purportedly undermining her.   Therefore, the ALJ failed to build the requisite "accurate and logical bridge" between the evidence and her conclusion that the objective medical evidence did not support Hollis-Earl's claims.

Furthermore, there was other medical evidence in the record that supported Hollis-Earl's testimony that the ALJ did not mention.   For example, the ALJ made no mention of the clinical observations of Hollis-Earl's primary physician, or records showing that Hollis-Earl's range of motion in her lower back was restricted (*see, e.g.*, Tr. 428).   The ALJ also did not mention Hollis-Earl's straight leg raise was positive for pain on two occasions (Tr. 276; Tr. 296); physical therapists reported she had decreased strength (Tr. 350); she made multiple visits to the emergency room for back pain; and she was taking a number of prescription medications including narcotics to manage her pain (Tr. 397–98).   In making a credibility finding, an ALJ must examine both the evidence favoring the claimant as

---

[5] The evidence that appears to support the ALJ's adverse credibility finding includes physical examinations showing Hollis-Earl's range of motion in her legs was largely intact, she had no weakness in her lower extremities, she had normal muscle tone with no spasms or atrophy, and her gait was normal.
[6] The evidence that appears to support Hollis-Earl's contentions includes an MRI showing a herniated disc, bilateral foraminal stenoisis, lower lumbar facet hypertrophy, and sacroiliitis; physical exams showing she was unable to squat or hop on one leg and had difficulty getting off the exam table, tandem walking, and walking on her heels and toes; her referral to a pain management specialist and a neurosurgeon; and her attempts at various treatments to relieve her pain, including physical therapy, epidural steroid injections, and a facet joint block.

well as the evidence favoring the claim's rejection.   *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).   The ALJ's failure to mention probative evidence leaves the Court wondering if she actually considered the full range of medical evidence.

### 2. Regulatory Factors

Another reason Hollis-Earl argues that the ALJ's credibility determination is flawed is because the ALJ failed to consider all of the regulatory factors.   In looking at the credibility determination, the Court agrees that the ALJ did not consider all seven of the regulatory factors.   She discussed Hollis-Earl's activities of daily living and the treatments other than medication that Hollis-Earl had received.   The ALJ also touched on other measures Hollis-Earl uses to relieve pain by mentioning that she needs a cane to walk, and touched on Hollis-Earl's functional limitations by questioning whether her physician restricted her to light duty at work or from working at all (Tr. 30–31).   Of those factors that the ALJ did discuss, at least some of her determinations are seriously flawed.

For example, with regard to factor 1—Hollis-Earl's activities of daily living— the ALJ stated that "it is difficult to verify [Hollis-Earl's] limited activities of daily living with any certainty" due to "relatively normal findings" on two physical examinations, including lack of spasm, atrophy, or weakness, no sensory loss, and a normal gait (Tr. 30, 31).   However, the physical examinations referenced by the ALJ also note that Hollis-Earl reported back pain that varied between a 7 and 10 in intensity, one physician observed tenderness in her spine and a restricted range of motion in her lower back, and the other physician was unable to assess her

neuromuscular status due to "pain and patient effort in her bilateral lower extremities."   The ALJ failed to adequately explain why she accepted certain information from the physical examinations as true, yet dismissed other information that supported Hollis-Earl's claims.   Furthermore, as Hollis-Earl pointed out, there is no evidence in the record that an individual who spends a majority of their time in bed would exhibit any of the signs enumerated by the ALJ, e.g., the individual wouldn't walk normally and/or would experience muscle spasms.

Another example of a flaw in the ALJ's discussion of the regulatory factors is with regard to factor 5—treatments other than medication that Hollis-Earl has received.   The ALJ concluded that she "has not received the type of treatment that one would expect for an individual with such severe disabling complaints as the claimant" (Tr. 31).   The ALJ's conclusion is problematic because she relied solely on purported inconsistencies between Hollis-Earl's testimony and the objective evidence, but the inconsistencies were derived from a misleading or inaccurate recitation of the evidence.   For instance, the ALJ represented that Hollis-Earl reported to her doctor that she did not want any more injections or any other treatment and that she was not interested in surgery (Tr. 30).   The ALJ concluded that "one would not expect an individual who . . . is only having one good day a week to turn down treatment options" and "this type of behavior suggests that [her] condition may not have been as disabling as she testified" (Tr. 31).   However, Hollis-Earl did not tell her doctor that she had no interest in surgery; she simply

said she would like to hold off on surgery while she investigated other, presumably non-surgical, treatment options (Tr. 31).   Additionally, Hollis-Earl did not refuse any treatments.   She merely told her doctor that she wanted to temporarily hold off on the injections to think about her options, and she resumed the injections within a couple of months.

There is one other troubling feature of the ALJ's discussion of factor 5 in that she ignored the longitudinal medical record which tends to lend support to Hollis-Earl's claims of intense and persistent pain.   The record shows Hollis-Earl made frequent and continuous efforts to treat her pain before eventually resorting to surgery.   In particular, she visited her regular physician regarding her back pain more than 10 times over the course of a year and a half.   She also made a number of visits to a pain management specialist and a neurosurgeon.   She tried a variety of treatment modalities in an attempt to relieve her pain, including prescription medication, physical therapy and epidural steroid injections; however, she reported only mild, temporary relief from those treatments.   According to SSR 96-7P, all of these things are "may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent pain."   SSR 96-7, at *7.

With respect to the other factors—the duration, frequency, and intensity of pain; any precipitating and aggravating factors; and the dosage, effectiveness, and side effects of medication—the ALJ did nothing more than briefly describe Hollis-Earl's relevant testimony (*See* Tr. 28).   It is not enough just to describe the

claimant's testimony with respect to each factor; the ALJ must also analyze how the testimony factored into the credibility analysis.   *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir 2009).   Importantly, the testimony that the ALJ failed to analyze seems to support, rather than contradict, Hollis-Earl's claims of pain and limitations.   Specifically, for over a year, Hollis-Earl consistently reported pain in her lower back between a 7 and 10 in intensity that radiated down her legs. She has also consistently reported that her pain worsens with increased physical activity, such as prolonged standing, walking for any distance, bending, and lifting, as well as prolonged sitting.   For over a year, she took some combination of Flexeril, hydrocodone, tramadol, Cymbalta, and naproxen on a daily basis.   She reported that her medications made her drowsy and diminished her ability to pay attention and follow spoken directions.

To conclude, the ALJ's explanation of how she reached her conclusion that Hollis-Earl's testimony was not credible is so poorly articulated that the Court is unable to meaningfully review it.   Furthermore, the ALJ's conclusion is not supported by substantial evidence because she failed to analyze a significant amount of relevant objective medical evidence as well as other evidence pertaining to a number of the factors listed in the federal regulations.   Because the determination of whether benefits are warranted depends largely on the ALJ's assessment of the credibility of Hollis-Earl's testimony, the Court concludes that this matter must be remanded to the ALJ.   The Court is not suggesting that the ALJ's credibility determination was incorrect, but only that greater elaboration is

necessary in order for the Court to sustain the credibility determination.

**B.    Obesity**

Hollis-Earl attacks the ALJ's failure to consider her obesity in determining her RFC.   In assessing a claimant's RFC, "an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment."   *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006).

Hollis-Earl argues that the ALJ's RFC determination is flawed because the ALJ failed to analyze what affect her weight had on her back pain.   As the Commissioner correctly points out, Hollis-Earl did not specifically claim obesity as an impairment on her disability application, most likely because she did not meet the body mass index ("BMI") threshold for obesity at the time she filed for benefits in April 2010.[7]   Within three months of filing for disability, however, she gained approximately 25 lbs. and she was considered obese based on her BMI by July 2010.[8]   At the time of her hearing one year later in July 2011, she was still considered obese based on her BMI.[9]   While Hollis-Earl did not specifically claim obesity as an impairment at her hearing, she was obviously obese and "the

---

[7] Hollis-Earl submitted her disability application on April 12, 2010 (Tr. 113, 119).   At an appointment on April 5, 2010 with Dr. Gemo Wong, she weighed 145 lbs. (Tr. 240).   At an appointment on April 16, 2010 with Dr. Wong, she weighed 151 lbs. (Tr. 237).   At 5'2", her BMI at those weights was 26.5 and 27.6, respectively, both of which fall in the category of "overweight."   A person does not fall into the category of "obese" until their BMI is 30 or higher.
[8] At her consultative exam with Dr. Memon in July 2010, Hollis-Earl weighed 165 lbs, resulting in a BMI of 30.2 (Tr. 424).   A BMI of 30 or over is categorized as "obese."
[9] From August 2010 until her hearing in July 2011, Hollis-Earl's weight fluctuated between 170–177 lbs. (Tr. 295–306; Tr. 401–09), resulting in a BMI exceeding 30.

references to [her] weight in [her] medical records were likely sufficient to alert the ALJ to the impairment." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

However, the ALJ made no mention of Hollis-Earl's obesity let alone discuss whether it impaired her ability to work (*See* Tr. 24–34). The Seventh Circuit has held that the failure to explicitly consider a claimant's obesity may be harmless error if obesity "was factored indirectly into the ALJ's decision" and the claimant "fail[ed] to specify how his obesity further impaired his ability to work." *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

Obesity is an indirect factor if the ALJ "predicated his decision upon the opinions of physicians who did discuss [the claimant's] weight." *Prochska*, 454 F.3d at 737. As discussed above, the ALJ's RFC determination was predicated, in part, on the opinions of three physicians and other medical records. Dr. Wong's report did not mention Hollis-Earl's weight (*See* Tr. 432–436). However, his records noted her height and weight each time she was seen in his office. Dr. Memon's report noted Hollis-Earl's height and weight, and stated that she was "a medium built African American female . . . [who] does not seem to be in acute distress" (Tr. 424). Other records, including those from Midwest Neurologists, also indicated Hollis-Earl's weight (*See* Tr. 314–38). Simply put, Hollis-Earl's weight was well-documented in the medical evidence, but no physician raised obesity as a major concern or mentioned that her weight aggravated her impairments or contributed to her physical limitations.

Furthermore, Hollis-Earl failed to explain how her obesity actually limits her functioning and exacerbates her impairments, and she did not point to any evidence suggesting as much.  She merely recited from SSR 02–1p which indicates that obesity "commonly leads to, and often complicates, chronic diseases of the . . . muscoluskeletal system" (Doc. 23, p. 14).  Because Hollis-Earl failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently analyzes her obesity, any error on the ALJ's part was harmless.

## C.    Medical Opinions

Hollis-Earl attacks how the ALJ evaluated the medical opinions in the record and derived her RFC.  In assessing a claimant's RFC, the ALJ must always consider and address medical source opinions.  Social Security Ruling 98-6P, 1996 WL 374184, at *7 (July 2, 1996) ("SSR 98-6P").  Medical opinions are statements from physicians or other acceptable medical sources "that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."   20 C.F.R. § 404.1527(a)(2).

Hollis-Earl argues that the ALJ's RFC determination is flawed because the ALJ rejected all of the medical opinions in the record and reached an independent medical conclusion regarding Hollis-Earl's limitations.   Hollis-Earl further argues that the ALJ failed to explain how she derived the limitations in her RFC assessment.   The Court agrees with Hollis-Earl that the ALJ's RFC determination

is flawed, however it is not because the ALJ rejected all of the medical opinions in the record and left an evidentiary deficit.   It is because she failed to follow the federal regulations in determining the weight that each medical opinion deserved and failed to properly articulate her reasoning for those determinations.

The record contained medical opinions from three physicians.   Dr. Wong, Hollis-Earl's treating physician, opined that Hollis-Earl was incapable of light work. Conversely Dr. Gotanco, the state agency physician, opined that Hollis-Earl was capable of light work, with a restriction on stooping and crouching.   Finally, the opinion of Dr. Memon, the consulting physician, was limited to a vague assertion that Hollis-Earl's "ability to sit, stand, walk, lift and carry may be affected due to her back pain and herniated disc."   The ALJ indicated that she afforded "little weight" to Dr. Wong's opinion and "some weight" to Dr. Memon and Dr. Gotanco's opinions. However, the ALJ's decision illustrates that she actually relied significantly on, and gave the most weight to, the opinion of Dr. Gotanco, the non-examining state agency physician.   In fact, it appears to the Court that the ALJ completely adopted Dr. Gotanco's assessment of Hollis-Earl's limitations and then, because Dr. Gotanco's opinion was approximately one year old by the time of the hearing, tacked on a few other restrictions suggested by Dr. Wong to allegedly account for the deterioration in Hollis-Earl's condition.

The biggest problem here is the ALJ's treatment of Dr. Wong's opinion.   Dr. Wong was Hollis-Earl's treating physician.   The opinion of a treating physician is "entitled to controlling weight if it is supported by medical findings and consistent

with substantial evidence in the record." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008)).   If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ "must offer 'good reasons' for declining to do so."   *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (internal citation omitted); 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ indicated that she did not give Dr. Wong's opinion controlling weight because it was "based largely on [Hollis-Earl's] subjective complaints" which the ALJ concluded were not fully credible (Tr. 31—32).   However, the Court has already determined that the ALJ's determination about the credibility of Hollis-Earl was flawed.   Another reason the ALJ did not give Dr. Wong's opinion controlling weight was because it was inconsistent with his records of his examinations.   But the ALJ did not point to any specific evidence or explain how she reached her conclusion that Dr. Wong's opinion was not supported by his own records. Therefore, the ALJ has not provided a satisfactory reason for discounting Dr. Wong's opinion.

Even if the ALJ properly concluded that Dr. Wong's opinion did not deserve controlling weight, the ALJ erred by failing to determine the weight it should be afforded in accordance with the checklist provided in the federal regulations.   *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (internal citations omitted); 20 C.F.R. § 404.1527(c)(2).   The regulations require the ALJ to consider the treatment relationship including the length, nature, and extent of the relationship and the frequency of examinations; the supportability and consistency of the

opinion with the record as a whole; whether the physician is a specialist; and any other factors the claimant or others bring to the ALJ's attention.   *Moss*, 555 F.3d at 561 (internal citations omitted); 20 C.F.R. § 404.1527(c)(2).   Here, apart from the ALJ's unhelpful statement that Dr. Wong's opinion was entitled to "little weight," the ALJ said nothing regarding this required checklist of factors.   The factors appear to support Dr. Wong.   His opinion was the most recent professional word on Hollis-Earl's physical impairments, by a treating physician who had seen her repeatedly for over a year with full access to her complete medical record to that point. No other medical opinion available to the ALJ provided a similarly comprehensive picture of Hollis-Earl's overall physical health at the time of the hearing.

Another problem is the ALJ's decision to rely most heavily on Dr. Gotanco's opinion.   Dr. Gotanco was the state agency physician.   He never examined, much less treated, Hollis-Earl.   Instead, his opinion was based on a review of Dr. Wong's records and Dr. Memon's report.   The ALJ indicated that his opinion was "generally consistent with the objective medical evidence of record" (Tr. 32). However, the ALJ did not point out what evidence she was referring to, or provide any explanation as to how it supported Dr. Gotanco's opinion.   She also failed to explain why Dr. Gotanco's opinion of Hollis-Earl's abilities was more consistent with the evidence than Dr. Wong's.   It seems completely illogical that the ALJ would discount the reports and records of Dr. Wong and Dr. Memon but then turn around and fully rely on an opinion which was based entirely on those very records

and reports.

If Dr. Wong's opinion was fully credited, it supports a finding that Hollis-Earl did not have the residual functional capacity to perform light work at all.  If she were limited to sedentary work, she would be found disabled as of her 50th birthday based on medical-vocational rule 201.14.  Because the determination of whether benefits are warranted depends largely on the weight afforded to Dr. Wong's opinion, the Court concludes that this matter must be remanded to the ALJ to determine if Dr. Wong's opinion deserves controlling weight, and if not, what weight it does deserve.

## CONCLUSION

Because of the ALJ's errors in evaluating Hollis-Earl's credibility and the medical opinions in this case, it must be remanded.  The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Hollis-Earl is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

The Commissioner's final decision denying Vanessa Hollis-Earl's application for social security disability benefits and supplemental security income is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:**   April 10, 2014

　　　　　　　　　　　　　　**s/ Clifford J. Proud　　　**
　　　　　　　　　　　　　　**CLIFFORD J. PROUD**
　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**